IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMIE ELIZABETH DUMOND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 11-1169 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff, Jamie Elizabeth Dumond, seeks judicial review of
a decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying her application for disability insurance
benefits under Title II of the Social Security Act, 42 U.S.C.
§§ 401-433. Presently before the Court are the parties' cross-
motions for summary judgment pursuant to Fed.R.Civ.P. 56. For
the reasons set forth below, Plaintiff's motion for summary
judgment seeking a remand of this case for further proceedings
will be granted, and the Commissioner's cross-motion for summary
judgment will be denied.

### PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance
benefits on September 2, 2009, alleging disability since August

12, 2009 due to foot pain and swelling.[1]  (R. 109-12, 137).
Following the initial denial of Plaintiff's application for
disability insurance benefits, Plaintiff requested a hearing
before an administrative law judge ("ALJ").  (R. 66-69, 70-71).
Plaintiff, who was accompanied by a non-attorney representative,
testified at the hearing which was held on January 28, 2011.  A
vocational expert ("VE") also testified.  (R. 22-44).

The ALJ issued a decision on May 23, 2011, denying
Plaintiff's application for disability insurance benefits based
on his determination that, despite severe impairments, Plaintiff
retained the residual functional capacity ("RFC") to perform
work existing in significant numbers in the national economy.[2]
(R. 11-19).  Plaintiff's request for review of the ALJ's
decision was denied by the Appeals Council on January 22, 2010.
(R. 1-6).  Thus, the ALJ's decision became the final decision of
the Commissioner.  This appeal followed.

**BACKGROUND**

Plaintiff's testimony during the hearing before the ALJ may
be summarized as follows:

---

[1] Disability insurance benefits are paid to individuals who are disabled as
defined in the Social Security Act and "insured;" that is, individuals who
have been employed long enough and paid Social Security taxes during such
employment. Based on Plaintiff's earnings record, she has acquired sufficient
quarters of coverage to remain insured for purposes of disability insurance
benefits through December 31, 2013.  (R. 10).

[2] The Social Security Regulations define RFC as the most a disability claimant
can still do despite his or her physical or mental limitations.  See 20
C.F.R. § 404.1545(a).

2

Plaintiff was born on August 31, 1962. She is married and resides with her husband. At the time of the hearing, Plaintiff, who is 5'3" tall, weighed 298 pounds. With regard to education, Plaintiff is a high school graduate. In the past, Plaintiff has worked in a cafeteria, in the deli department of a grocery store, as the manager of a floral shop and as a meat packer. Plaintiff stopped working on June 3, 2009 due to foot and leg pain.[3] (R. 26-29).

Plaintiff has been diagnosed with Haglund's deformity.[4] She also has occasional problems with the hallux, or big toe, on her left foot.[5] As a result of her foot pain, Plaintiff is limited to standing for 5 minutes at a time. She then has to sit down and elevate her feet to avoid swelling.[6] Plaintiff is prescribed

---

[3] When asked to describe her foot pain, Plaintiff testified: "It's sharp. It's like sticking a hot knife into my feet." (R. 38).

[4] Haglund's deformity is a bony enlargement on the back of the heel. The soft tissue near the Achilles tendon becomes irritated when the bony enlargement rubs against shoes. This often leads to painful bursitis, which is an inflammation of the bursa (a fluid-filled sac between the tendon and bone). Symptoms include a noticeable bump on the back of the heel; pain in the area where the Achilles tendon attaches to the heel; swelling in the back of the heel; and redness near the inflamed tissue. Non-surgical treatment includes medication, ice, exercises, heel lifts, heel pads, shoe modification, physical therapy, orthotic devices and immobilization. www.foothealthfacts.org.

[5] Plaintiff's medical records include a diagnosis of Hallux rigidus, a form of degenerative arthritis, which is a disorder of the joint located at the base of the big toe. It causes pain and stiffness in the joint, and with time it gets increasingly harder to bend the toe. The disorder can be very troubling and even disabling, since we use the big toe whenever we walk, stoop down, climb up, or even stand. www.foothealthfacts.org.

[6] Plaintiff testified that she was instructed to elevate her feet above her head to alleviate swelling by Dr. Spahn. (R. 30).

topical Voltaren for her foot pain,[7] and she wears compression socks.  Plaintiff also takes Aleve or Tylenol every 4 hours on a daily basis for pain relief and medication to control hypertension which makes her dizzy on occasion.  (R. 29-32, 34).

Plaintiff has a driver's license, and she drives a few times a week.  (R. 27).  On a typical day, Plaintiff rises, takes a shower, gets dressed and sits down with her feet elevated.  She then alternates between performing household chores and sitting down to elevate her feet.  Plaintiff shops for groceries with her husband.  However, she returns to their car to sit while he checks out.  With respect to social activities, Plaintiff visits her mother where she can sit in a recliner.  (R. 35-36).  As to hobbies, Plaintiff plays the piano.  She also watches television and reads the Bible.[8]  (R. 36-37).

---

[7] Voltaren is used to relieve pain from osteoarthritis (arthritis caused by a breakdown of the lining of the joints) in certain joints such as those in the knees, ankles, feet, elbows, wrists and hands.  Voltaren is in a class of medications called nonsteroidal anti-inflammatory drugs.  It works by stopping the body's production of a substance that causes pain.  Topical Voltaren is applied to the skin 4 times a day.  www.nlm.nih.gov/ medlineplus/druginfo.

[8] In a Function Report completed by Plaintiff on November 11, 2009, Plaintiff described a typical day as follows:

"Wake up - normal care routines - make bed - straighten up - sit down prop feet to reduce swelling - do household chores with rest periods. Grocery store trips require rest periods in store, most are done quickly.  Evening I fix supper & do clean up, then I sit down & prop my swollen feet up."

Plaintiff also indicated in the Function Report that (1) she tries to walk "some" on a daily basis, but she must take breaks and walk slow due to foot pain; (2) she prepares meals on a daily basis, but it takes much longer than

4

**VOCATIONAL EXPERT TESTIMONY**

At the hearing on Plaintiff's application for disability

insurance benefits, the ALJ asked the VE to assume a

hypothetical individual of Plaintiff's age, education and work

experience who (a) can lift and carry 20 pounds occasionally and

10 pounds frequently; (b) can stand or walk for 2 hours during

an 8-hour workday; (c) can sit for 6 hours during an 8-hour

workday; (d) can never climb ladders, ropes or scaffolding; (e)

can only balance occasionally; (f) can frequently handle and

finger; and (g) must avoid all exposure to heights and moving

machinery.[9]  The ALJ then asked the VE whether the hypothetical

individual could perform any of Plaintiff's past relevant work

or any other work.  The VE testified that the individual could

not perform any of Plaintiff's past relevant work, but that the

individual could perform other unskilled, sedentary work

it used to as a result of her need for breaks to elevate her feet; (3) she
can still perform indoor and outdoor household chores, but it takes 2 to 3
times longer than it used to due to foot pain; (4) she goes outside on a
daily basis and drives a car; (5) she shops once or twice a week for 1 to 2
hours with breaks to rest her legs and feet; and (6) she socializes with
friends and family 3 to 4 times a week and goes to church, but she must sit
more in social settings rather than participate in activities due to her foot
pain.  (R. 145-49).

[9] Under the Social Security Regulations, the exertion levels the VE was asked
to assume the hypothetical individual could perform meet the criteria for
"light" work which is defined as follows: "Light work involves lifting no
more than 20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds.  Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing or
pulling of arm or leg controls.  To be considered capable of performing a
full or wide range of light work, you must have the ability to do
substantially all of these activities.  If some can do light work, we
determine that he or she can also do sedentary work, unless there are
additional limiting factors such as loss of fine dexterity or inability to
sit for long periods of time."  20 C.F.R. § 404.1567(b).

5

including the jobs of an assembler (50,000 nationally), an alarm monitor (10,000 nationally) and a ticket checker (50,000 nationally).[10] (R. 40-41). If, in addition, the hypothetical individual was required to elevate her feet over her head every 2 hours, the VE testified that the individual would not be employable.[11] Similarly, if the hypothetical individual was off task 20% of the work day, the VE testified that the individual would not be employable. (R. 41-42).

Plaintiff's representative then asked the VE whether an individual who missed 3 or more days of work a month due to a medical condition would be employable, and the VE testified that she would not. To follow-up on the representative's question, the ALJ asked the VE whether 2 absences a month would be tolerated by an employer, and the VE replied: "no." (R. 42-43).

---

[10] The Social Security Regulations define sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). It is not clear why the VE limited his response to the ALJ's hypothetical question to sedentary jobs when the question clearly assumed an individual who could perform the exertion requirements of light work.

[11] In response to further questioning by the ALJ, the VE testified that an individual who required the ability to elevate her feet at the waist level every two hours during the work day also was not employable. However, if the individual only required the ability to elevate her feet on a 12" stool every two hours during the work day, the VE testified that the individual could perform approximately 50% of the jobs cited in response to the ALJ's original hypothetical question. (R. 42).

6

**MEDICAL EVIDENCE**

On August 12, 2009, Plaintiff was seen by Dr. Kreig Spahn, her primary care physician ("PCP"), for complaints of pain and swelling in her feet that was aggravated by working on a concrete floor.[12] Dr. Spahn's examination of Plaintiff's bilateral lower extremities revealed "swelling and tenderness [at] Achilles' insertion with some bony swelling of [heel bones] noted."[13] Dr. Spahn referred Plaintiff to Dr. Richard Sieber, a podiatrist, for evaluation. (R. 197-98).

Plaintiff's initial evaluation by Dr. Sieber took place on August 14, 2009. Plaintiff's physical examination revealed bumps on the posterior aspect of both heels, right worse than left; normal range of motion ("ROM") of the ankle joint; and muscle strength of 5/5. Dr. Sieber's assessment was "Haglund's deformity, bilaterally, right greater than left." In his notes of this office visit, Dr. Sieber indicated that because Plaintiff's condition involves a bony deformity, there "is not a good conservative treatment." Since Plaintiff had already tried

---

[12] According to Dr. Spahn's office note, Plaintiff had experienced swelling in her feet for years. However, the pain was recent. (R. 197).
[13] The Achilles tendon connects your calf muscle to your heel bone. It is used for walking, running and jumping. www.nlm.nih.gov.medlineplus/ency. Heel problems are common and can be painful. Often, they result from too much stress on your heel bone and the tissues that surround it. That stress can come from injuries; bruises that you get walking, running or jumping; wearing shoes that do not fit or are not made well; and being overweight. These can lead to tendinitis, bursitis and fasciitis, which are all types of inflammation of the tissues that surround your heel. Over time the stress can cause bone spurs and deformities. www.nlm.nih.gov/medlineplus/heelinjuriesanddisorders.

physical therapy ("PT") without improvement, Dr. Sieber wrote Plaintiff a prescription for heel lifts. Dr. Sieber also ordered x-rays of Plaintiff's feet and instructed her to return in 2 weeks to evaluate the effectiveness of the heel lifts and to review her x-ray results. (R. 209). The x-rays of Plaintiff's feet which were taken that day revealed "moderate to severe posterior plantar [heel bone] spurring bilaterally as well as spurring of the Achilles tendon insertions upon the [heel bone]...." (R. 181).

Plaintiff's follow-up visit with Dr. Sieber occurred on September 2, 2009. Plaintiff reported that she had obtained little pain relief from the heel lifts, and that she had to quit her job due to the pain. In addition to bilateral Haglund's deformity, Dr. Sieber assessed Plaintiff with bilateral equinus.[14] Dr. Sieber prescribed PT for Plaintiff; informed her that surgery is "the only definitive correction" for her condition; and instructed her to follow-up in 3 weeks. (R. 208).

Plaintiff returned to her PCP, Dr. Spahn, on September 9, 2009 for "management." The notes of this office visit indicate that Plaintiff planned to file a claim for disability based on the pain in her feet; that shoe inserts had helped but did not

---

[14] Equinus is a condition in which the upward bending motion of the ankle joint is limited. Someone with equinus lacks the flexibility to bring the toe of the foot toward the front of the leg. www.foothealthfacts.org.

take Plaintiff's pain away; and that Plaintiff was not interested in surgery which had been suggested by Dr. Seiber. Dr. Spahn's assessment of Plaintiff during this office visit included edema and worsening osteoarthritis in her ankles and feet.[15]  Plaintiff was instructed to return in 2 weeks.  (R. 199).

On September 23, 2009, Plaintiff returned to Dr. Sieber for a follow-up visit.  Plaintiff reported that her feet were "feeling better" with PT.  Plaintiff's physical examination revealed more ROM at the ankle joints; muscle strength of 5/5; and muscle tone within normal limits.  Plaintiff was instructed to complete PT and to return as needed.  (R. 207).  Plaintiff was seen by Dr. Spahn the next day to follow-up on her edema. Plaintiff reported some water weight loss and some cramping in her legs.  Dr. Spahn described Plaintiff's edema as "improved." (R. 200).

On December 2, 2009, Dr. Sieber prescribed further PT for Plaintiff for the Haglunds' deformity and complaints of equinus. (R. 236).  Plaintiff commenced PT at Keystone Rehabilitation Systems the next day.  (R. 230-31, 234-35).

On December 22, 2009, Gary Empfield, a non-medical State agency disability examiner, completed a Physical RFC Assessment

---

[15] Dr. Spahn prescribed furosemide for Plaintiff's edema.  Furosemide, a "water pill," is used to reduce swelling and fluid retention cause by various medical problems.  It causes the kidneys to get rid of unneeded water and salt from the body into the urine.  www.nlm.nih.gov/medlineplus/druginfo.

of Plaintiff based on a review of her file. With respect to

exertional limitations, Mr. Empfield opined that Plaintiff could

occasionally lift and carry 20 pounds and frequently lift and

carry 10 pounds; that Plaintiff could stand and/or walk a total

of 6 hours in an 8-hour workday; that Plaintiff had no

limitations in her ability to sit during an 8-hour workday; and

that Plaintiff's ability to push and pull with her upper and

lower extremities was unlimited. In addition, Mr. Empfield

indicated that Plaintiff had no postural, manipulative, visual,

communicative or environmental limitations, and that Plaintiff

retained the ability to perform her past relevant work as a

delicatessen worker based on her description of the job.[16] (R.

50-56).

Plaintiff returned to Dr. Spahn for management of her foot

pain on January 12, 2010. Plaintiff's blood pressure was

192/84, and her physical examination revealed diffusely swollen

feet bilaterally and Achilles' tendon tenderness with bony

prominence. Dr. Spahn's assessment was worsening hypertension

and worsening osteoarthritis in Plaintiff's ankles and feet.

Plaintiff was prescribed hydrochlorothiazide for her

---

[16] In a Work History Report completed by Plaintiff on November 6, 2009,
Plaintiff indicated that her job as a delicatessen worker involved 8 hours of
standing and walking and 30 minutes of sitting (presumably for a break or
lunch). (R. 158). Thus, based on his own findings concerning the limitation
in Plaintiff's ability to walk and stand, i.e., 6 hours in an 8-hour work
day, Mr. Empfield's statement that Plaintiff retained the ability to perform
her past job as a delicatessen worker based on her description of the job is
erroneous.

hypertension and instructed to return in 2 weeks.[17]  (R. 250-51).
During the follow-up visit on February 2, 2010, Plaintiff
reported taking the hydrochlorothiazide as prescribed and her
blood pressure was 146/80.  Dr. Spahn described Plaintiff's
hypertension as "improved."[18]  (R. 248).

     After 24 sessions at Keystone Rehabilitation Systems, which
included ultrasound, cold packs, therapeutic exercises and
instruction in a home exercise program, Plaintiff was discharged
from PT on February 4, 2010.  At the time of discharge,
Plaintiff continued to report bilateral foot and heel pain
limiting her ability to stand and walk.  (R. 269-97).

     Plaintiff was seen by Dr. Sieber for a follow-up visit on
February 16, 2010.  Plaintiff reported that she had been doing
well, and that although she had a little foot pain once in a
while, it was improved.  Plaintiff still had a large bony bump
on the posterior aspect of her heel, but the equinus was not as
bad at that point.  Plaintiff had good ROM in her ankle joint,
and she reported no pain when wearing certain shoes.  Dr. Sieber
recommended heel lifts and backless shoes and instructed
Plaintiff to return as needed.  (R. 307).

_____

[17] Like furosemide, hydrochlorothiazide is a "water pill."  Hydrochlorothiazide
is used to treat high blood pressure and fluid retention caused by various
conditions, including heart disease.  It causes the kidneys to get rid of
unneeded water and salt from the body into the urine.
www.nlm.nih.gov/medlineplus/druginfo.
[18] There are no references in Dr. Spahn's office notes for this visit relating
to Plaintiff's foot pain.  However, Plaintiff was attending PT for this
condition at the time.

11

During an office visit with Dr. Spahn on April 8, 2010, Plaintiff reported "[n]othing new." In his assessment, Dr. Spahn described Plaintiff's high cholesterol level as unchanged, her hypertension as well-controlled, and her edema as improved. There is no reference to complaints of foot pain, but Plaintiff's then-current medication list included Voltaren transdermal gel for foot pain. Plaintiff was instructed to return as needed. (R. 247).

On August 6, 2010, Dr. Sieber completed a Medical Questionnaire regarding his treatment of Plaintiff. Dr. Sieber noted that Plaintiff's diagnosis of bilateral Haglund's deformity was based on x-rays and physical examination; and that this condition resulted in daily swelling in Plaintiff's feet and ankles, as well as significant pain, decreased ROM, fatigue, an antalgic gait and disturbed sleep. As to physical abilities, Dr. Sieber opined that Plaintiff could occasionally lift 10 pounds and frequently lift 5 pounds; that Plaintiff could stand/walk a total of 3 hours during an 8-hour workday for a maximum 15 minutes at a time; and that Plaintiff could sit 8 hours during an 8-hour workday for a maximum of 4 hours at a time. Dr. Sieber also opined that Plaintiff did not need to elevate her feet during the day, but that she was incapable of working on a "regular and continuing basis," *i.e.*, 8 hours/day for 5 days/week. In an average month, Dr. Sieber opined that

Plaintiff would miss 4 days of work due to foot pain. (R. 239-41).

Plaintiff returned to Dr. Spahn for a medication check and prescription refills on August 25, 2010. In his assessment, Dr. Spahn described Plaintiff's high cholesterol level as unchanged and her hypertension as well-controlled. In connection with Plaintiff's high cholesterol level, Dr. Spahn ordered lab tests and discussed the benefits of exercise with Plaintiff "at length." There are no references to foot pain in the office notes of this visit; however, her then-current medications included Voltaren transdermal gel for foot pain. Plaintiff was instructed to return as needed. (R. 245).

During Plaintiff's next office visit with Dr. Spahn, which took place on October 18, 2010, Plaintiff complained of swelling in both legs with pain and discoloration, fatigue and shortness of breath.[19] Dr. Spahn's assessment included well-controlled hypertension, edema, shortness of breath and abnormal weight gain. Plaintiff was referred to cardiac care for tests for the edema and shortness of breath. There is no reference to complaints of foot pain in the office notes of this visit, but Plaintiff's then-current medications included Voltaren

---

[19] Dr. Spahn's notes indicate that Plaintiff weighed 317 pounds at the time of this office visit, having gained 9 pounds since her August office visit. (R. 242).

13

transdermal gel for foot pain.  Plaintiff was instructed to
return as needed.  (R. 242-44).

An echocardiogram on October 20, 2010, revealed (a) mild
concentric left ventricular hypertrophy, (b) normal overall left
ventricular systolic function, (c) trace mitral regurgitation,
and (d) mild pulmonic regurgitation.  Chest x-rays taken the
same day were described as normal.  (R. 252, 255).  The next
day, Plaintiff reported less swelling and shortness of breath,
and the echocardiogram taken that day was normal.  (R. 254).

A report of blood tests dated October 29, 2010 indicates
Plaintiff's iron level was low.  She was instructed to take an
over-the-counter iron supplement and to follow-up with Dr. Spahn
in a month.  (R. 256).

Plaintiff's follow-up appointment with Dr. Spahn was
scheduled for December 9, 2010.  Plaintiff reported feeling a
little "peppier" since she started taking the iron supplement
for anemia.  Dr. Spahn's assessment was improved anemia.  There
is no reference to complaints of foot pain in the office notes
of this visit; however, Plaintiff's then-current medication list
included Voltaren transdermal gel for foot pain.  Plaintiff was
instructed to return as needed.  (R. 312).

On December 10, 2010, Dr. Spahn completed a Medical
Questionnaire concerning Plaintiff's medical conditions and
resulting limitations.  Based on his physical examination of

14

Plaintiff and x-rays, Dr. Spahn listed Plaintiff's diagnoses as Hallux rigidus, osteoarthritis of the ankles and Haglund's deformity.  Dr. Spahn described the symptoms of these conditions as pain and swelling in the feet.  With respect to physical abilities, Dr. Spahn opined that Plaintiff could frequently lift 20 pounds; stand or walk 2 hours in an 8-hour workday for 15 minutes at a time; and sit without interruption for 8 hours in an 8-hour workday.  Dr. Spahn further opined that Plaintiff could not work on a "regular and continuing basis," meaning 8 hours/day for 5 days/week, due to the severity of her pain and the number of breaks she would require; that Plaintiff must elevate her feet every 2 hours during the day for pain relief; and that Plaintiff would miss 3 days of work in an average month due to an increase in pain and swelling from standing and walking.  (R. 303-05).

**ALJ'S DECISION**

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if his physical or

mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ
must follow a sequential evaluation process. See 20 C.F.R.
§ 404.1520(a)(4). The process was described by the Supreme
Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\*    \*    \*

Pursuant to his statutory authority to implement the
SSI Program, (footnote omitted) the Secretary has
promulgated regulations creating a five-step test to
determine whether an *adult* claimant is disabled. Bowen v.
Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted).
The first two steps involve threshold determinations that
the claimant is not presently working and has an impairment
which is of the required duration and which significantly
limits his ability to work. See 20 C.F.R. §§ 416.920(a)
through (c)(1989). In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989). If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry. § 416.920(d). If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps. At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience. If the
claimant cannot do his past work or other work, he
qualifies for benefits.

\*    \*    \*

493 U.S. at 525-26.

16

The claimant bears the burden of establishing steps one through four of the sequential evaluation process for making disability determinations. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy in light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability, and the medical evidence established that Plaintiff suffers from the following severe impairments: bilateral Haglund's deformity, bilateral equinus, hallux rigidus, bilateral ankle osteoarthritis, hypertension and obesity. (R. 12).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, the listings in Section 1.00 relating to the Musculoskeletal System, Section 4.00

relating to the Cardiovascular System, and Section 7.00 relating to Hematological Disorders. (R. 13-14).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform light work that does not require (a) more than 2 hours of standing and walking cumulatively; (b) more than 6 hours of sitting; (c) climbing ladders, ropes and scaffolding; (d) more than occasional balancing; (e) frequent handling and fingering; and (f) exposure to heights and moving machinery.[20]  (R. 14-17). The ALJ then proceeded to step four, finding that in light of Plaintiff's RFC, she is unable to perform any of her past relevant work. (R. 17).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in the national economy, including the jobs of an assembler, an alarm monitor and a ticket checker. (R. 17-18, 41).

---

[20] The RFC assessment must address both the remaining exertional and non-exertional capacities of a claimant. Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; *i.e.,* all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions. It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision). In addition to these activities, it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes). Social Security Ruling 96-8p.

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day/5 days a week or an equivalent work schedule. See Social Security Ruling 96-8p.

There are three RFC assessments in the administrative record in this case. The first RFC assessment was completed by a non-medical State agency disability examiner on December 22, 2009. (R. 50-56). This RFC assessment, which indicates that Plaintiff's exertional limitations limit her to light work but

19

does not specifically address her ability to work on a "regular and continuing basis," properly was not considered by the ALJ in rendering his decision. See Shedden v. Astrue, Civ. No. 4:10-CV-2515, 2012 WL 760632, at *10-11 (M.D.Pa. Mar. 7, 2012)("This court has repeatedly found [assessments] from non-medical disability adjudicators insufficient evidence of a claimant's residual functional capacity.").

The other RFC assessments in this case were completed by Plaintiff's long-time treating physicians. As noted in the summary of the medical evidence, Dr. Spahn, Plaintiff's PCP, rendered the opinion on December 10, 2010 that Plaintiff retained the abilities to lift, stand/walk and sit required for light work, but that she could not perform such work on a "regular and continuing basis" due to severe pain requiring frequent breaks, and she would miss an average of 3 days a month because "her pain and swelling will progress daily as she continues to stand/walk." (R. 303-05). Similarly, Dr. Sieber, the foot specialist who treats Plaintiff for Haglund's deformity and other foot problems, rendered the opinion on August 6, 2010 that Plaintiff retained the abilities to lift, stand/walk and sit required for sedentary work, but that she could not work on a "regular and continuing basis" and would miss an average of 4 days a month because "Haglund's deformity causes ... pain in

legs especially in shoe gear," and the "pain often worsened with ambulation."

Because the record lacks an assessment by a physician supporting the ALJ's conclusion that she retains the RFC to perform work on a sustained basis, Plaintiff asserts the ALJ erred in rejecting the opinions of Drs. Spahn and Sieber which dictated a finding of disability based on the Social Security Administration's definition of RFC and the VE's testimony during the hearing before the ALJ regarding the absenteeism tolerance of employers. In response, the Commissioner cites the recent decision of the Court of Appeals for the Third Circuit in Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir.2012), for the proposition that an ALJ is not required to rely on a medical opinion in formulating a claimant's RFC, and the Commissioner seeks judgment in his favor as a matter of law.

After consideration, the Court rejects the Commissioner's argument. In so doing, the Court agrees with the following discussion of this argument by the district court in Gunder v. Astrue, Civ. No. 4:11-CV-00300, 2012 WL 511936, at *15, (M.D.Pa. Feb. 15, 2012):

\*  \*  \*

The Commissioner frequently argues that his administrative law judges have the ultimate responsibility of fashioning the residual functional capacity of a claimant. It is clear that an administrative law judge is responsible for making the ultimate determination regarding

21

residual functional capacity and disability and need not accept a conclusory statement from a treating physician. Chandler v. Commissioner of Soc. Sec., __ F.3d __, 2011 WL 6062067 (3d Cir. Dec. 7, 2011); 20 C.F.R. §§ 1546(c) and 1527(e). However, a precedential opinion from this Circuit requires medical opinion or evidence supporting the administrative law judge's residual functional capacity assessment, that is, the claimant can perform the lifting, carrying, standing, walking, sitting, etc., requirements of either sedentary, light, medium, heavy or very heavy work on a full-time basis. Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence).

Any argument from the Commissioner that his administrative law judges can set the residual functional capacity in the absence of medical opinion or evidence must be rejected in light of Doak. Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is dicta and must be disregarded. Government of Virgin Islands v. Mills, 634 F.2d 746, 750 (3d Cir.2011)(a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel).

Bare medical records without expert medical interpretation are rarely enough to establish a claimant's residual functional capacity. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir.1990). When there is a lack of evidence regarding the functional abilities of a claimant, this court must follow the principles set forth in Doak....

See also Shedden, supra (ALJ cannot speculate as to a claimant's

RFC but must have medical evidence, and generally a medical

opinion regarding the functional capabilities of the claimant,

supporting his determination; because there was no assessment

regarding the claimant's exertional abilities from a treating or evaluating physician and the bare medical records were insufficient for the ALJ to make such a determination, it was incumbent upon the ALJ to obtain such an assessment).

Because the only assessments of Plaintiff's RFC that could be considered by the ALJ in this case supported Plaintiff's claim for disability insurance benefits, the Court agrees with Plaintiff that the ALJ erred in rejecting such assessments. The Court also agrees with Plaintiff that the ALJ's stated reasons for rejecting the treating physicians' opinions in this case were improper. With respect to the ALJ's claims that the opinions were "inherently inconsistent" with the treating physicians' office notes and "disproportionately" relied on Plaintiff's subjective complaints, the Court can find no support for these claims. Plaintiff's foot problems were readily ascertainable by physical examination and confirmed by x-rays, as noted by both physicians in their respective medical source statements. Moreover, the Court agrees with Plaintiff that any notations by Drs. Spahn and Sieber regarding improvement in Plaintiff's foot pain must be considered in context. The physicians' RFC assessments are predictions of the limitations Plaintiff would experience in competitive employment. In the absence of such sustained activity, improvement with treatment is not unexpected.

As to the ALJ's statement that the treating physicians'
opinions "fail to address how the claimant somehow maintains the
ability to go for daily walks, mow the lawn, and do all of the
household chores," this statement is based on the Function
Report completed by Plaintiff in November 2009 and her hearing
testimony.  As noted by Plaintiff, however, this statement
blatantly mischaracterizes her representations in the Function
Report and her hearing testimony which consistently indicated a
need for numerous breaks while engaging in daily activities and
supports the treating physicians' opinions that Plaintiff could
not engage in substantial gainful activity on a "regular and
continuing basis."

Finally, as to the ALJ's claim that the absence of
documented emergency room visits for foot pain, surgical
intervention and referral to a pain specialist undermine the
opinions of Drs. Spahn and Sieber regarding Plaintiff's RFC, the
Court knows of no authority requiring such evidence before a
claimant can be found disabled.

Based on the foregoing, this civil action will be remanded
to the Commissioner to reconsider the reasons offered for
discounting the opinions of Drs. Spahn and Sieber regarding

Plaintiff's ability to engage in sustained work activity and to
obtain an assessment of Plaintiff's RFC by a consultative
examiner.

William L. Standish
United States District Judge

Date: June 28, 2012